O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

NANCY SWEET,                          )   Case No. CV 09-02653 DDP (RZx)
                                      )
              Plaintiff,              )   **ORDER DENYING DEFENDANT'S MOTION**
                                      )   **FOR SUMMARY JUDGMENT**
       v.                             )
                                      )   [Motion filed on July 2, 2010]
UNITED PARCEL SERVICE, INC.,          )
                                      )
              Defendant.              )
_____       )

     This matter comes before the court on a Motion for Summary
Judgment or, in the Alternative, Partial Summary Judgment filed by
Defendant United Parcel Service, Inc. ("UPS").  Defendant moves for
summary judgment on the grounds that UPS employee Plaintiff Nancy
Sweet was properly classified as an exempt employee and lawfully
denied overtime pay and compensation for rest or meal breaks from
May 6, 1999 to the present.  Specifically, UPS argues that it has
established that the executive, the administrative, and/or the
motor carrier exemptions apply to Sweet's work as an On Road Full-
Time Supervisor ("FTS") and Preload FTS; and that the
administrative exemption applies to Sweet's time spent as a Preload
Dispatch FTS.  Plaintiff opposes the motion and argues that UPS has
failed to establish that she was an exempt employee.

1    After reviewing the papers submitted by the parties and

2    hearing oral argument, the court DENIES Defendant's motion.

3    **I.    Background**

4    Sweet has been an employee of UPS since 1983. (Sweet Decl. ¶

5    2.)  Since 1999, Sweet has been a FTS and has at various times

6    worked in the positions of Preload FTS, On Road FTS, and Preload

7    Dispatch FTS.

8    **TABLE 1.**

| Date | FTS Position | UPS Facility/Center |
|------|--------------|---------------------|
| 1/98–1/04 | Preload FTS | San Fernando/Pacoima |
| 1/04–3/06 | On Road FTS | San Fernando/Newhall |
| 3/06–6/06 | Preload FTS | San Fernando/Studio |
| 6/06–11/07 | On Road FTS & on Special Assignment | San Fernando/Pacoima |
| 11/07–6/08 | Preload Dispatch FTS | San Fernando/Newhall |
| 6/08–6/09 | Preload FTS | Lancaster/Lancaster |
| 6/09–Present | On Road FTS | San Fernando/Studio |

(Senaga Decl. ¶ 4; Rini Decl. ¶ 4; Wilson Decl. ¶ 3; Pastoral Decl.
¶ 4; Sexton Decl. ¶ 3; Fuller Decl. ¶ 3; P. Thompson ¶ 5; Roxbury
Decl. ¶ 2.; <u>see also</u> Plaintiff's Statement of Genuine Issues of
Material Fact ¶¶ 1, 39, 69.)

19    In each of the three positions held by Sweet at UPS since May

20    6, 1999 and during the brief period from June 2006 to November 2007

21    when Sweet worked half her time on special assignments, <u>see</u> <u>infra</u>

22    Table 1, Sweet was classified as an exempt employee.  Sweet claims

23    that she was misclassifed during all of these times.

24    In October 2008, Sweet sued UPS in California Superior Court,

25    alleging that UPS failed to pay overtime compensation, failed to

26    provide meal and rest breaks, failed to keep and maintain accurate

27    wage and time records, conversion, and unfair competition.  In

28

1  December 2008, UPS removed the case to federal court based on

2  diversity jurisdiction.

3  **II.   Legal Standard**

4        **A.   Motion for Summary Judgment**

5        A motion for summary judgment must be granted when "the

6  pleadings, depositions, answers to interrogatories, and admissions

7  on file, together with the affidavits, if any, show that there is

8  no genuine issue as to any material fact and that the moving party

9  is entitled to a judgment as a matter of law." Fed. R. Civ. P.

10  56(c).  A party seeking summary judgment bears the initial burden

11  of informing the court of the basis for its motion and of

12  identifying those portions of the pleadings and discovery responses

13  that demonstrate the absence of a genuine issue of material fact.

14  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

15       Where the moving party will have the burden of proof on an

16  issue at trial, the movant must affirmatively demonstrate that no

17  reasonable trier of fact could find other than for the moving

18  party.  On an issue as to which the nonmoving party will have the

19  burden of proof, however, the movant can prevail merely by pointing

20  out that there is an absence of evidence to support the nonmoving

21  party's case.  See id.  If the moving party meets its initial

22  burden, the nonmoving party must set forth, by affidavit or as

23  otherwise provided in Rule 56, "specific facts showing that

24  there is a genuine issue for trial." Anderson v. Liberty Lobby,

25  Inc., 477 U.S. 242, 250 (1986).

26       It is not enough for a party opposing summary judgment to

27  "rest on mere allegations or denials of his pleadings." Id. at

28  259.  Instead, the nonmoving party must go beyond the pleadings to

3

1  designate specific facts showing that there is a genuine issue for

2  trial. Celotex, 477 U.S. at 325.  The nonmoving party need not

3  produce evidence in a form that would be admissible at trial in

4  order to avoid summary judgment, id. at 324, but "only admissible

5  evidence may be considered by the trial court in ruling on a motion

6  for summary judgment," Beyene v. Coleman Sec. Servs., Inc., 854

7  F.2d 1179, 1181 (9th Cir. 1988).  A genuine issue exists if "the

8  evidence is such that a reasonable jury could return a verdict for

9  the nonmoving party," and material facts are those "that might

10 affect the outcome of the suit under the governing law." Anderson,

11 477 U.S. at 248.  Thus, the "mere existence of a scintilla of

12 evidence" in support of the nonmoving party's claim is insufficient

13 to defeat summary judgment.  Id. at 252. There is no genuine issue

14 of fact "[w]here the record taken as a whole could not lead a

15 rational trier of fact to find for the nonmoving party."

16 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

17 587 (1986). Disputed issues of fact are resolved against the moving

18 party. General Elec. Co. v. Joiner, 522 U.S. 136, 142 (1997).

19    **B. California Wage and Hour Law**

20    California substantive law applies in this diversity action.

21 See Erie R. Co. v. Tompkins, 304 U.S. 64 (1938). Regulations

22 governing overtime pay in California are issued by California's

23 Industrial Welfare Commission ("IWC"). Ramirez v. Yosemite Water

24 Co., Inc., 20 Cal. 4th 785, 795 (1999).  Wage orders issued by the

25 IWC are quasi-legislative regulations that are to be interpreted in

26 the same manner as statutes.  See Cal. Lab. Code § 1185; see also

27 Watkins v. Ameripride Services, 375 F.3d 821, 825 (9th Cir.

28 2004)(citing Collins v. Overnite Trans. Co., 105 Cal. App. 4th 171,

4

174, 178-79 (2003)).  Exemptions to wage and hour laws—under both
California law and the federal Fair Labor Standards Act
("FLSA")-are narrowly construed, and the burden of showing that an
exemption applies falls on the employer who claims the exemption.
Reich v. Am. Driver Serv., Inc., 33 F.3d 1153, 1156 (9th Cir.
1994); Nordquist v. McGraw-Hill Broadcasting Co., Inc., 32 Cal.
App. 4th 555, 562 (1995).

**III. Discussion**

UPS raises three affirmative exemptions that, UPS argues,
encompass the three positions held by Sweet at UPS and support the
employer's classification of Sweet at all relevant periods as
exempt.  In particular, UPS contends that the motor carrier,
executive, and administrative exemptions apply to Sweet's work as
an On Road FTS and Preload FTS and that the administrative
exemption applies to Sweet's work as a Preload Dispatch FTS and her
work while on special assignment.  The court considers the
applicability of the three exemptions in turn.

**A. Motor Carrier Exemption**

First, UPS argues that a motor carrier exemption applies to
Sweet's work as an On Road FTS and Preload FTS.[1]

IWC Wage Order No. 9, codified at Title 8 § 11090 of the
California Code of Regulations, regulates wages, hours, and working
conditions in the transportation industry.  Cal. Code Regs. tit. 8,
§ 11090(3)(L).  Here, the parties agree that IWC Wage Order No. 9

---

[1]  UPS, however, excludes the time Sweet was an On Road FTS
but spent half of her time on special assignments, namely from
March 2007 until November 2007.  UPS also does not argue that the
motor carrier exemption applies to Sweet's work as a Preload
Dispatch FTS.

1   generally governs UPS and, by extension, its employees. Under

2   section 3(A) of the IWC Wage Order, employees must be compensated

3   at 1.5 times the employee's normal rate of pay for all overtime

4   worked. Cal. Code Regs. tit. 8 § 11090(3)(A).  UPS argues, however,

5   that California Wage Order No. 9 section 3(L), which includes two

6   exemptions from the overtime pay provision for covered motor

7   carriers and drivers, applies to Sweet in her positions as an On

8   Road FTS and a Preload FTS.  Therefore, UPS argues, Sweet was

9   correctly classified by UPS as an exempt employee not entitled to

10  overtime pay or meal breaks while employed in those positions.

11      IWC Wage Order No. 9 section 3(L) contains the following

12  provision related to drivers and motor carriers exempting certain

13  employees in such professions from the overtime requirements of

14  section 3(A) of the Wage Order:

15

16          The provisions of this section are not applicable
            to employees whose hours of service are regulated
            by:
17          (1) The United States Department of Transportation
            Code of Federal Regulations, Title 49, Sections
18          395.1 to 395.13, Hours of Service of Drivers, or;
            (2) Title 13 of the California Code of Regulations,
19          subchapter 6.5, Section 1200 and the following
            sections, regulating hours of drivers.

20

21  IWC 11090 § 3(L); see also Wamboldt v. Safety-Kleen Systems, Inc.,

22  2008 WL 728884 (N.D. Cal. 2008) ("In other words, the IWC's motor

23  carrier exemption applies to employees whose hours of service are

24  regulated by either (1) federal regulations regarding hours of

25  service of drivers; or (2) California state regulations regarding

26  the hours of drivers.").

27      Here, UPS argues that section 3(L)(1) applies to Sweet.  Sweet

28  argues that sections 3(L)(1) does not apply to her because she was

1  never regulated by the Department of Transportation.  (Pl.'s Opp.
2  17:6-10.)  In the alternative, Sweet argues that even if section
3  3(L)(1) applies, it does so pursuant to California's workday, not
4  weekly, maximum hour requirements and, therefore, only applies to
5  days in which she actually drove a qualifying vehicle for UPS.
6  (Pl.'s Opp. 18:2-6.)

7        The preliminary question is whether California Wage Order No.
8  9 section 3(L)(1) applies to Sweet. Because this is a question of
9  state law, the court is "bound by decisions of the state's highest
10 court." Vestar Dev. II, LLC v. Gen. Dynamics Corp., 249 F.3d 958,
11 960 (9th Cir. 2001)(quoting Lewis v. Tel. Employees Credit Union,
12 87 F.3d 1537, 1545 (9th Cir. 1996)); Strother v. S. Cal. Permanente
13 Med. Group, 79 F.3d 859, 865 (9th Cir. 1996) (same).  Where, as
14 here, the California Supreme Court has not yet addressed the
15 particular issue of interpretation with which we are confronted,
16 the court is "obligated to follow the decisions of the state's
17 intermediate courts." Easyriders Freedom F.I.G.H.T. v. Hannigan, 92
18 F.3d 1486, 1494 n. 4 (9th Cir. 1996) (citation and quotations
19 omitted).

20       Section 3(L)(1) exempts employees "whose hours of service are
21 regulated by" the Department of Transportation Code of Federal
22 Regulations sections 395.1 to 395.13.  Sections 395.1 to 395.13 set
23 the federal maximum hour restrictions for motor carrier employees.
24 49 C.F.R. § 395.1.  These sections apply—and by extension the
25 Department of Transportation Code of Federal Regulations govern—all
26 "drivers."  49 C.F.R. § 395.1(a)(1). As defined by the regulations,
27 a "driver" is "any person who operates any commercial motor
28 vehicle."  49 C.F.R. § 390.5.  A "commercial motor vehicle" is a

motor vehicle "used on a highway in interstate commerce to transport passengers or property when the vehicle . . . [h]as a gross vehicle weight . . . of 5,536 kg (10,001 pounds) or more . . . ." <u>Id</u>.  In sum, the Department of Transportation regulates persons who (1) are drivers; (2) in interstate commerce; (3) of vehicles weighing 10,001 or more pounds.  <u>See</u> <u>Watkins v. Ameripride Services</u>, 375 F.3d 821, 825 (9th Cir. 2004).  For purposes of this case, *if* UPS succeeds in establishing that Sweet has met the above three conditions *then* the Department of Transportation regulations apply to her and she, accordingly, falls within the section 3(L)(1) exemption and is not entitled to overtime pay.  <u>See, e.g.</u>, <u>Wamboldt v. Safety-Kleen Systems, Inc.</u>, 2008 WL 728884, at *9 (N.D. Cal. 2008) (explaining that in determining whether the motor carrier exemption applies the court "must initially determine whether [the plaintiff/employee] transported property in interstate commerce in a vehicle weighing more than 10,001 pounds").

Before the court determines whether UPS has established that Sweet did indeed meet the above three conditions, the court considers Sweet's second argument, namely that irrespective of whether she falls under the motor carrier exemption found in section 3(L)(1), California's daily workday limits apply to her work at UPS.

In 1999, the California legislature passed the Eight-Hour-Day Restoration and Workplace Flexibility Act (hereinafter "Act").  <u>Collins</u>, 105 Cal. App. 4th at 176.  The Act restored "the state's daily overtime rule in favor of the less restrictive weekly overtime rule found in the Federal Labor Standards Act."  <u>Id</u>.  After the Act was passed, there was some question as to the effect

8

1    of the Act on pre-existing exemptions to the overtime rules.  <u>See,</u>

2    <u>e.g.,</u> <u>id</u>.

3         In <u>Collins</u>, the California Court of Appeal held that truck

4    drivers employed by Overnite, a motor carrier, came within the

5    motor carrier exemption recognized in Wage Order No. 9 section 3.[2]

6    <u>Id</u>. at 180 (holding that in passing the Act, the California

7    legislature intended to leave undisturbed the wage order exemptions

8    in effect in 1997 including the motor carrier exemption).  In that

9    case, as here, the truck drivers argued that the Act eliminated the

10   motor carrier exemption and brought motor carriers within the

11   overtime rules of Labor Code section 510 (which require over-time

12   pay for work in excess of eight hours in one workday) and other

13   provisions of the Act, entitling them to overtime pay.  <u>Id</u>. at 177.

14   The California Court of Appeal disagreed.  <u>Id</u>. at 180.

15        Instead, the California Court of Appeal concluded that

16   pursuant to basic rules of statutory interpretation, the Act did

17   not eliminate, or even alter, the motor carrier act exemption.  <u>Id</u>.

18   at 179.  "It should not be inferred that the Legislature intended

19   to repeal the [motor carrier] exemption without express declaration

20   of intent."  <u>Id</u>.  Accordingly, the court held that "the IWC had

21   power to retain [the motor carrier exemption] and it has in fact

22   done so. . . .  Therefore, we conclude that [the plaintiff truck

23   drivers] come within the motor carrier exemption of wage order No.

24   9 . . . ."  <u>Id</u>. at 180.

25

26   _____

27        [2] As noted in that <u>Collins</u>, an identical exemption as that
     found in Wage Order No. 9 section 3(L) is contained in 11 other
28   wage orders covering industries that may involve use of motor
     carriers.  <u>See</u> <u>Collins</u>, 105 Cal. App. 4th at 176 n.1.

1    Here, as the truck drivers did in <u>Collins</u>, Sweet argues that

2  the maximum workday hourly provisions of California Labor Code

3  section 510 apply to her and, therefore, the motor carrier

4  exemption does not.  The court, however, is obligated to follow the

5  California Court of Appeal's interpretation of Wage Order No. 9, a

6  quasi-statute.  <u>Easyriders Freedom F.I.G.H.T.</u>, 92 F.3d at 1494 n.

7  4.  The motor carrier exemption found in Wage Order No. 9 section

8  3(L)(1) has not been eliminated—or even altered—by the Act; and, as

9  discussed above, the exemption potentially applies to Sweet.[3]

10 <u>Collins</u>, 105 Cal. App. 4th at 180.  The remaining question, then,

11 is whether Sweet was indeed regulated by the Department of

12 Transportation, as required to fall within the 3(L)(1) exemption.[4]

---

14    [3]  Sweet relies on two cases in support of her argument that
   the motor carrier exemption in Wage Order No. 9 does not apply to
15 her.  The first, <u>Gomez v. Lincare, Inc.</u>, 173 Cal. App. 4th 508
   (2009), is inapposite because in that case the drivers seeking
16 overtime pay for days when they drove brought their claim only
   under Wage Order No. 9 Section 3(L)(2), which concerns an exemption
17 under California law for motor carriers, and not under Wage Order
   No. 9 section 3(L)(1), at issue here.  The second, <u>Wamboldt v.</u>
18 <u>Safety-Kleen Systems, Inc.</u>, 2008 WL 728884 (N.D. Cal. 2008) is a
   federal, not state case, and of limited aid in interpreting state
19 law.  Even considering <u>Wamboldt</u>, the court in that case did not
   conclude that the Act in any way eliminated or affected the motor
20 carrier exemption found in 3(L)(1).  To the contrary, the court
   recognized the potential applicability of the exemption to the
21 drivers in that case but found that material facts were still in
   dispute as to whether the driver in that case was involved, as a
22 regular part of his duties, in interstate commerce subjecting him
   to the Department of Transportation's jurisdiction and, by
23 extension, to the motor carrier exemption.  <u>Wamboldt</u>, 2008 WL
   728884, at *12 (N.D. Cal. 2008).  Any mention of the affect of the
24 Act and its workday limits to section 3(L)(1) in <u>Wamboldt</u> was
   purely dicta, because the court did not reach that issue.  <u>Gomez</u>
25 and <u>Wamboldt</u>, therefore, do not affect the holding in <u>Collins</u>.

26    [4]  The court notes that even if Sweet does fall within the
   motor carrier exemption and is therefore, for purposes of her
27 overtime pay claim, deemed to be exempt, truck drivers are not
   subject to exemption for motor carriers for purposes of meal and
28 rest break requirements, contrary to <u>Collins</u>.  <u>See Cicairos v.</u>
   (continued...)

1   Because the Department of Transportation's authority is the

2   only issue under the federal FLSA motor carrier exemption, looking

3   to this federal standard and its interpretation by courts is

4   appropriate here.  See Watkins v. Ameripride Servs., 375 F.3d 821,

5   825 n.2 (9th Cir. 2004); Bell v. Farmers Ins. Exch., 87 Cal. App.

6   4th 805, 815 (2001) (noting that regulatory guidance and case law

7   under federal regulations are used to interpret similar language at

8   the state level).[5]

9        **1.  Driver**

10   As noted above, the Department of Transportation has authority

11   to regulate those employees who (1) drive (2) a commercial motor

12   vehicle (3) in interstate commerce.  See 49 U.S.C. § 31502. With

13   respect to the first element, UPS and Sweet do not dispute that

14   Sweet on occasion drove UPS trucks, or her own personal vehicle, to

15   transport UPS packages. (See Fuller Decl. ¶ 10; Roxbury Decl ¶ 9;

16   Sexton Decl. ¶ 10; Rinin Decl. ¶ 10-11; Pastoral Decl. ¶ 11; Wilson

17   Decl. ¶¶ 11-12.)  The parties dispute, however, how much of Sweet's

18

19

———————————

20        [4](...continued)
21   Summit Logistics, 133 Cal. App. 4th 949, 956 (2005).

22        [5]  The Court recognizes that the exemption set forth in Wage
     Order 9 is not to be confused with the federal FLSA motor carrier
23   exemption.  See Aqsalud v. Pony Express Courier Corp. Of Am., 833
     F.2d 809, 810 (9th Cir. 1987) (explaining that California overtime
24   laws are not preempted by the Motor Carrier Act exemption under the
     FLSA). Although the two are quite similar, as Judge Fletcher
25   pointed out in her concurrence in Watkins v. Ameripride Services,
     they are not the same.  Watkins, 375 F.3d at 830 (Fletcher, J.,
26   concurring). Section 13(b)(1) of the FLSA exempts all employees
     over whom the Department of Transportation has authority, while
27   Wage Order No. 9 exempts employees who are actually regulated by 49
     C.F.R. §§ 395.1-395.13. Id.  Here, the difference is immaterial
28   because Sweet was a "driver" and, therefore, actually regulated by
     49 C.F.R. §§ 395.1-395.13.

1   time was spent driving and how much of her driving was done in a

2   UPS commercial vehicle.

3       In considering the Department of Transportation's authority to

4   regulate interstate motor carrier operations and drivers, courts

5   have recognized that the Department's authority has limits.

6   Accordingly, the Department of Transportation's authority is

7   subject to a *de minimus* rule.  See Pyarmid Motor Freight Corp. v.

8   Ispass, 330 U.S. 695 (1947).  Here, UPS has the burden of

9   establishing that Sweet's involvement in "safety-affecting

10   activity," (here, driving a commercial vehicle) is *de minimis*.  See

11   Crooker v. Sexton Motors, Inc., 469 F.2d 206, 210 (1st Cir. 1972).

12   Although bright line percentages are inherently arbitrary, and

13   often a qualitative analysis will be more instructive, the courts

14   that have assessed whether an employee's involvement in safety-

15   affecting activity is *de minimis* have tended to do so by looking to

16   percentages.  For example, in Morris v. McComb, 332 U.S. 422

17   (1947), the Supreme Court considered four percent relevant enough

18   to invoke the authority of the Department of Transportation.

19       Here, UPS presented data showing that Sweet delivered packages

20   in 31% of her work weeks as an On Road FTS and 4% of her work weeks

21   as a Preload FTS.  (See Stombom Decl. ¶¶ 10-13, Exs. B, D; Nash

22   Decl. ¶ 5, Ex. A; Lavery Decl. ¶¶ 11-12.)  Sweet disputes this

23   data.  She states that she did not have a valid Department of

24   Transportation (or "DOT") license for at least two periods of time

25   during which the data indicates she drove, and she states that even

26   when she did drive she often delivered packages in her personal

27   vehicle.  (Sweet Decl. ¶¶ 43, 57, 70, 75, 84, 87.)

28

1    Having considered both parties arguments and evidence, the
2  court concludes that a triable issue of fact remains as to whether
3  driving commercial vehicles for UPS constituted a non-*de minimus*
4  amount of Sweet's work, thereby subjecting her to regulation by the
5  Department of Transportation.  The court notes in particular the
6  failure of UPS to produce disaggregated raw data or Sweet's time
7  logs indicating on which dates Sweet drove and what trucks she
8  drove.  The failure to produce specific data is particularly
9  important with respect to Sweet's work as a Preload FTS, where UPS
10 claims she spent 4% of her time driving, a value that could be
11 argued to be *de minimus*.  The court also notes UPS's failure to
12 respond to Sweet's claim that she lacked a valid DOT license at
13 various times during her employment with UPS.  Until these
14 questions are resolved, a triable issue of fact remains.

15              **2.  Interstate Commerce**

16    The second consideration in determining whether the Department
17 of Transportation has authority to regulate Sweet is whether she
18 engaged in interstate commerce.  An employee need not transport
19 goods across state lines to engage in interstate commerce:

20          The result is no different where the vehicles do
            not actually cross State lines but operate solely
21          within a single State, if *what is being transported*
            is actually moving in interstate commerce within
22          the meaning of both [the FLSA and MCA]; the fact
            that other carriers transport it out of State is
23          not material.

24 29 C.F.R. § 782.7(b)(1)(emphasis added); <u>see also</u> 49 U.S.C. §
25 13501. Thus, an employee transports goods in interstate commerce
26 when he or she drives within a single State and is part of an
27 interstate movement of the goods.  <u>See</u> <u>Klitzke v. Steiner Corp</u>.,
28 110 F.3d 1465, 1467 (9th Cir. 1997) (concluding that plaintiff

                                  13

engaged in interstate commerce where his route was "entirely within Oregon, but over half of his deliveries [were] items received from out of state").

Here, UPS has established that, and Sweet does not offer evidence in dispute of the fact, over 56% of the shipments into the West Los Angeles district where Sweet worked during the liability period originated outside the State of California, and over 64% of the shipments from the West Los Angeles district were transported to another state in the same period. (Hill Decl. ¶ 7, Ex. B.) There is no material issue of fact as to whether the packages in UPS's trucks are part of an interstate movement of goods, and Sweet, therefore, engaged in interstate commerce.

### 3. Commercial vehicle

Finally, to show that Sweet was regulated by the Department of Transportation and is, therefore, exempt from the requirements of IWC Wage Order No. 9, UPS must establish that Sweet's driving activity occurred in vehicles that weighted at least 10,001 pounds.[6] UPS has presented evidence that over 90% of the vehicles in UPS's California West Los Angeles district vehicle fleet weigh 10,001 pounds or more. UPS has also presented data that show that Sweet drove vehicles that weighed 10,001 pounds or more. (Strombom Decl. ¶¶ 11-13, Ex. B, D.) UPS's analysis, however, contains no raw data or indication of how the data was verified and UPS states

---

[6] This is because, as mentioned above, Wage Order No. 9 exempts those employees "whose hours of service are regulated by" 49 C.F.R. §§ 395.1 to 395.13. Accordingly, those regulations set limits on hours for drivers of "commercial motor vehicles." "Commercial motor vehicles" are defined at 49 C.F.R. § 390.5 as a motor vehicle used in interstate commerce that weight 10,001 pounds or more. 49 C.F.R. § 390.5.19.

14

1   in relation to its data that it made unsupported assumptions. Id.

2   For example, UPS's analysis "assumes that vehicles without

3   available weight data weigh 10,001 pounds or more." Id. Sweet

4   states that she frequently drove her personal vehicle when moving

5   packages, did not have a DOT license for large periods of time

6   while employed at UPS, and drove only on occasion. (Sweet Decl. ¶¶

7   43, 57, 70, 75, 84, 87.)  Because UPS has failed to establish that

8   Sweet drove a commercial vehicle, i.e. one that weighed more than

9   10,001, as a non-de minimus part of her work duties, a triable

10  issue of fact remains as to this third prong.

11         **4. Motor Carrier Exemption — Conclusion**

12      UPS has not established that Sweet was subject to the

13  Department of Transportation's regulation and was, therefore,

14  exempt from overtime while she worked as an On Road FTS and Preload

15  FTS.  Accordingly, there is a triable issue of fact as to whether

16  the motor carrier exemption found in Wage Order No. 9 section

17  3(L)(1) applied to Sweet.

18    **B.  Administrative and Executive Exemptions**

19      There is substantial overlap of the facts presented by both

20  parties with respect to the applicability of the administrative and

21  executive exemptions to Sweet's work as an On Road FTS, Preload

22  FTS, and Preload Dispatch FTS.  Therefore, the court discusses

23  UPS's claims with respect to the administrative and executive

24  exemptions together.

25      The administrative exemption applies to an employee who (1)

26  performed office work directly related to the management policies

27  or general business operations of UPS; (2) customarily and

28

regularly exercised discretion and independent judgment; (3) either (a) regularly and directly assisted an employee in a bona fide executive or administrative capacity, or (b) performed under only general supervision work along specialized or technical lines, requiring special training, experience, or knowledge, or (c) executed under only general supervision special assignments and tasks; (4) was primarily engaged in exempt duties; and (5) earned at least twice the minimum wage.  See IWC Wage Order No. 9-2001 § 1(A)(2).

The executive exemption applies to an employee (a) whose duties and responsibilities involve the management of a customarily recognized department or subdivision; (b) who customarily and regularly directs the work of two or more other employees; (c) who has the authority to hire or fire another employee, or whose recommendations as to hiring or firing, and as to the advancement and promotion or any other change of status will be given particular weight; (d) who customarily and regularly exercises discretion and independent judgment; (e) who is primarily engaged in exempt duties; and (f) who earns at least twice the California minimum wage.  See IWC Wage Order No. 9-2001 § 1(A)(1).

UPS argues that at all times that Sweet was employed by UPS—including the time when she was classified as an On Road FTS and was performing special assignments and when she was a Preloand Dispatch FTS-Sweet fell within the administrative or executive exemption and was therefore exempt.  (Def.'s Rep. 18:22.) Sweet argues that neither exemption applies.[7] (Pl.'s Opp. 9:24-28.)

---

[7]  Sweet also argues that UPS is collaterally estopped from
(continued...)

16

1    The Fair Labor Standards Act and California recognize an

2  exemption from overtime for persons "employed in a bona fide

3  executive, administrative, or professional capacity." 29 U.S.C. §

4  213(a)(1); IWC Wage Order No. 9-2001 § 1(A)(1)(c). It is the burden

5  of an employer to show entitlement to an exemption, <u>Donovan v.</u>

6  <u>Nekton, Inc.</u>, 703 F.2d 1148, 1151 (9th Cir. 1983) (per curiam), and

7  exemptions are "to be liberally construed to apply to the furthest

8  reaches consistent with Congressional direction." <u>Klem v. County</u>

9  <u>of Santa Clara</u>, 208 F.3d 1085 (9th Cir. 2000). To that end, this

10  court narrowly construes exemptions "against . . . employers" and

11  withholds such exemptions "except as to persons plainly and

12  unmistakenly within their terms and spirit." <u>Id</u>. at 1089 (internal

13  quotation marks and citations omitted).

14    The administrative exemption requires the fact finder to

15  "determine whether [the employees] carry out day-to-day operations .

16  . . or whether they administer business affairs . . . [of the

17  company]." <u>Bell v. Farmers Insurance Exchange</u>, 87 Cal. App. 4th

18  805, 822 (2001). The employee's work must, under California's

19  exemption at issue here, "directly related to management policies or

20  general business operations of his/her employer or his employer's

21  customers"; and the employee must "customarily and regularly

22  exercise discretion and independent judgment." 8 Cal. Code Regs.,

23  tit. 8, § 11040, subd. 1(A)(2)(a)(I), 1(A)(2)(b); <u>see also</u> <u>Combs v.</u>

24

25    [7](...continued)
26  asserting that Sweet was an exempt employee as a Preload FTS
   because, in another case, an employee who was a Preload FTS was
27  found to be non-exempt. This argument fails because a
   determination of exempt status is fact specific. <u>See</u> <u>Lopez v. UPS</u>,
28  Slip Copy, 2010 WL 728205 (N.D. Cal. 2010); <u>Norquist v. McGraw-Hill</u>
   <u>Broadcasting Co.</u>, 32 Cal. App. 4th 555 (1995).

1    _Skyriver Communications, Inc._ 159 Cal. App. 4th 1242, 1254 (2008)

2    (explaining that the federal and California administrative

3    exemptions closely parallel one another and explaining that in order

4    to have the privilege of the exemption an employer must demonstrate

5    that its employee preformed "work directly related to assisting with

6    the running or servicing of the business, as distinguished, for

7    example, from working on a manufacturing production line or selling

8    a product in a retail or service establishment"). The Ninth Circuit

9    has recognized the administrative exemption as being restricted to

10   those employees who have responsibility for how the business is run:

11   "'advising management' . . . is directed at advice on matters that

12   involve policy determinations, i.e., how a business should be run or

13   run more efficiently, not merely providing information in the course

14   of the customer's daily business operation . . . ." _Brattt v._

15   _County of L.A._, 912 F.2d 1066, 1070 (9th Cir. 1990).

16        The executive exemption requires that the employee have

17   "authority and discretion to manage . . . on a day-to-day basis

18   without supervision and control from [the employer]." _Baldwin v._

19   _Trailer Inns, Inc_., 266 F.3d 1104, 1116 (9th Cir. 2001). In _Baldwin_,

20   the Ninth Circuit noted that "executive" work has generally been

21   defined as the following job functions, _when_ those functions are

22   performed in the course of the management of an employee's

23   department or supervision of the employees under him or her:

24        Interviewing, selecting, and training of employees;
          setting and adjusting their rates of pay and hours
25        of work; directing their work; maintaining their
          production or sales records for use in supervision
26        or control; appraising their productivity and
          efficiency for the purpose of recommending
27        promotions or other changes in their status;
          handling their complaints and grievances and
28        disciplining them when necessary; planning the

1   work; determining the techniques to be used;
    apportioning the work among the workers;
2   determining the type of materials, supplies,
    machinery or tools to be used or merchandise to be
3   bought, stocked and sold; controlling the flow and
    distribution of materials or merchandise and
4   supplies; providing for the safety of the men and
    the property.

5
Id. at 1114 n.6.
6
7       Here, Sweet contends that in all her relevant positions UPS

8   had a formula for its policies and procedures that restricted any

9   and all discretion on her part. (Sweet Decl. ¶ 25.) She states

10  that she was not permitted to disregard UPS policy or procedures

11  and that UPS demanded conformity in all of its operations. (Id. ¶

12  29.) She states that she spent a significant amount of time

13  performing manual work, delivering packages in her own car on the

14  way home, moving package cars, handling daily packages, and

15  shuttling packages to drivers. (Id. ¶¶ 43, 57, 84, 89.) These

16  tasks, she argues, are not exempt. (Pl.'s Opp. 12:19-28.) She

17  further states that the individuals who submitted declarations

18  stating that Sweet spent less than 50% of her time preforming

19  hourly work did not have personal knowledge of how she spent her

20  time in her capacity as an On Road FTS or Preload FTS. (Sweet

21  Decl. ¶ 30.) In direct contradiction to the declarations submitted

22  by UPS, Sweet states that she "did not customarily or regularly

23  exercise discretion or independent judgment as to matters of

24  consequence or significance" and was "forbidden from exercising

25  discretion." (Id.)

26      Sweet declares that her decisions were "of little consequence

27  or significance to UPS," and not of the sort recognized by the

28  administrative exemption—which considers office work directly

19

1  related to management and company policy that customarily involves

2  independent judgment and discretion–or the executive

3  exemption—which considers managerial work that contemplates

4  discretion to independently manage matters of significance.  (Pl.'s

5  Opp. 15:11-20.)  Sweet states that she followed UPS's formulaic and

6  extensive policies that afforded her little discretion and no

7  discretion of import.  (See e.g. Sweet Decl. ¶ 25.)

8      Sweet further states that she did not manage a recognized

9  department or subdivision of UPS as either an On Road FTS or

10  Preload FTS; nor did she have the authority to hire, fire, or

11  promote and her recommendations were not given particular weight.

12  (Sweet Decl. ¶¶ 6-23, 41-45.)  For example, Sweet states that she

13  was reprimanded after recommending termination of a fellow employee

14  who assaulted her and was consequently removed from the UPS center.

15  (Id. ¶¶ 13-14.)  Sweet further claims that Keith Rini (her manager)

16  and Herb Wilson (her division manager) told Sweet in front of other

17  employees that she could not fire anyone.  (Id. ¶¶ 14, 16.)  Sweet

18  claims she only had the authority to monitor and report any hourly

19  employees' infractions of UPS's policies.  (Id. ¶¶ 7-9.)

20      UPS argues that while employed as an On Road FTS and Preload

21  FTS Sweet was both engaged in management and administrative work.

22  UPS asserts that Sweet trained employees, adjusted their hours, and

23  directed their work, all of which affected the company's

24  productivity.  (Def.'s Motion 4:11-26.)  UPS further asserts that

25  Sweet's managerial duties included ensuring adherence to UPS's

26  policies and procedures, assessing staffing levels, and conducting

27  performance evaluations.  (Def.'s Motion 5:1-21.)  UPS also

28  maintains that Sweet, both as an On Road FTS and Preload FTS,

1  managed a recognized subdivision of UPS and exercised discretion
2  and independent judgment on matters of significance. (<u>Id</u>. at 8.)
3  With respect to her administrative duties, UPS argues that Sweet,
4  like the dispatcher in <u>Perine v. ABF Freight Systems, Inc</u>., 457
5  F.Supp.2d 1004, 1015-16 (C.D. Cal. 2006) was required to plan in a
6  manner that directly impacted UPS's general business operations,
7  and therefore performed "administrative duties." UPS further
8  argues that while Sweet was employed as a Preload Dispatch FTS the
9  administrative exemption applied.

10     Sweet explained that as a Preload Dispatch FTS she was
11  assigned by UPS to work in a designated UPS preload operation.
12  (Sweet Decl. ¶ 62.) Her position, she states, was as a supervisor
13  and she worked under a manager. The preload operation, Sweet
14  states, contains the delivery route for each package's final
15  destination and is where packages are sorted and loaded for
16  delivery. (<u>Id</u>. ¶ 63.) Sweet states that she regularly performed
17  hourly work because the facility was under-staffed and there were
18  not enough hourly employees to complete the work. (<u>Id</u>. ¶ 74.) She
19  also describes her regular duties as follows: "Any decisions I make
20  are based on the plan and based on UPS's loop principles. These
21  are prescribed procedures. I was specifically directed by my
22  division manager and the operations manager that I was to follow
23  the given plan." (<u>Id</u>. ¶ 65.)

24     The court is mindful of its role at summary judgment and is
25  cognizant that "[c]redibility determinations, the weighing of the
26  evidence, and the drawing of legitimate inferences from the facts
27  are jury functions, not those of a judge . . . ." <u>Anderson</u>, 477
28  U.S. at 255. Given the numerous disputed facts in this case, and

the individual and factual nature of the resolution of the
determination of what Sweet's duties, responsibilities, and
authority actually were, the court concludes that genuine issues of
material fact remain concerning Sweet's discretion and duties as an
On Road FTS, a Preload FTS, and a Preload Dispatch FTS.   In
particular, the court finds that there remain triable issues of
material fact concerning (1) whether Sweet's opinions on
hiring/firing were given particular weight; (2) whether Sweet had
the authority to make an independent choice with respect to matters
of significance; (3) whether Sweet was primarily engaged in exempt
(administrative and/or executive respectively) duties; (4) whether,
for purposes of the executive exemption, Sweet managed a recognized
department or subdivision; and (5) whether, for purposes of the
administrative exemption, Sweet performed office work directly
related to the management policies or general business operations
of UPS.   Accordingly, the court denies UPS's motion for summary
judgment.[8]

## IV. Conclusion

For the reasons set forth above, the court DENIES UPS's motion
for summary judgment.

IT IS SO ORDERED.


Dated: October 13, 2010

DEAN D. PREGERSON
United States District Judge

---

[8] Because Sweet spent at least half her time while on special
assignment as an On Road FTS , any determination of her exempt
status during that time is related to a determination of whether
she was exempt while employed as an On Road FTS.   The court,
therefore, also denies UPS's motion for summary judgment with
respect to the months Sweet worked on special assignment.